## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | CRIMINAL NO. 4:18-0650 |
| | § | |
| JOSE BLADEMIR PORTILLO- | § | |
| SARAVIA, | § | |
| and | § | |
| JOSE EFRAIN MATEO. | § | |

## MEMORANDUM AND ORDER

Before the Court are Defendants Jose Blademir Portillo-Saravia's ("Portillo") and Jose Efrain Mateo's ("Mateo") Motions to Suppress and Request for Evidentiary Hearing ("Motions to Suppress" or "Motions") [Docs. # 24, # 25]. The Government filed a response,[1] the Court held a two-day evidentiary hearing,[2] and the parties submitted supplemental briefing.[3] The Motions are now ripe for decision. Based on the evidence and testimony introduced at the hearing, the

---

[1] The United States of America's (United States) Response in Opposition to Defendants' Motions to Suppress Evidence and Request and Evidentiary Hearing ("Response") [Doc. # 33]. The United States of America's Unopposed Motion for Leave to Accept Brief Filed One Day Late as Timely [Doc. # 35], is **granted**.

[2] Hearing Minutes and Order dated March 4, 2019 [Doc. # 36]; Hearing Minutes and Order dated March 7, 2019 [Doc. # 38].

[3] Defendant's Supplemental Brief in Support of Motion to Suppress ("Portillo's Supplement") [Doc. # 44]; The United States of America's Post-Hearing Brief in Opposition to Defendants' Motions to Suppress Evidence ("Government's Supplement"); Defendant Jose Mateo's Supplemental Brief in Support of Motion to Suppress ("Mateo's Supplement") [Doc. # 48]; Supplement to the United States of America's Post-Hearing Brief in Opposition to Defendants' Motions to Suppress Evidence [Doc. # 49].

parties' briefing, counsels' arguments, and pertinent legal authority, the Court **grants in part and denies in part** both Motions to Suppress.

## I.   BACKGROUND

### A.   Procedural Background

On October 31, 2018, a federal grand jury charged Defendants Mateo and Portillo with unlawful possession of a firearm by an illegal alien.[4]  *See* 18 U.S.C. § 922(g)(5)(A).

In February 2019, Defendants Mateo and Portillo each filed a Motion to Suppress.  Defendants contend that the Court should suppress: (1) bullets seized from their persons during a traffic stop, (2) handguns seized from the car they previously occupied, and (3) their statements made at the scene of their arrests.  On February 28, 2019, the Government filed a single Response opposing both Motions.

The Court held a two-day evidentiary hearing on Defendants' Motions.[5] Over the course of the two days, three Houston Police Department ("HPD") officers testified, and the officers' body camera footage was introduced.[6] Defendants did not testify or call witnesses.  Instead, they cross-examined the officers, played segments of the officers' camera footage, presented still images

---

[4]     Indictment [Doc. # 12].

[5]     Suppression Hearing (Day One) ("Trans. 1") [Doc. # 41]; Suppression Hearing (Day Two) ("Trans. 2") [Doc. # 42].

[6]     Officer Joseph Cruz's Camera Footage ("Cruz's Camera"); Officer Moises Saldana's Camera Footage ("Saldana's Camera"); Officer Eddie Castillo's Camera Footage ("Castillo's Camera").

from the footage, introduced transcripts of that footage,[7] and introduced a police report by Officer Cruz and its supplement.[8]   Following the hearing, the Government and Defendants submitted supplemental briefing.

### B.    Factual Background

Officer Joseph Cruz is a 10-year veteran of the HPD.[9]   On October 3, 2018, Officer Cruz was assigned to District 17 in southwest Houston, a high crime area with a heavy gang presence.[10]   At about 4:24 p.m., while driving solo in his patrol car eastbound on Gustine Lane toward South Gessner Road, Officer Cruz saw a maroon Nissan Sentra driving westbound.[11]   The Nissan had four occupants, none of whom wore seatbelts.[12]

---

[7]    Translation of Officer Moises Saldana's Body-Worn Camera Footage ("Translation of Saldana's Camera Footage") [Doc. # 38-5]; Translation of Officer Eddie Castillo's Body-Worn Camera Footage ("Translation of Castillo's Camera Footage") [Doc. # 38-6].

[8]    Houston Police Department, Report No. 1254980-18 Original ("Cruz's Report") [Doc. # 36-1]; Houston Police Department, Report No. 1254980-18 Supplement ("Cruz's Supplement") [Doc. # 36-1].

[9]    Trans. 1 at 7:7-10, 7:22-24.

[10]    *Id.* at 13:1-6.   Every testifying officer averred that District 17, and more specifically the Gustine Lane area, is a high-crime area.   *Id.* at 8:2-8; Trans. 2 at 8:19-25, 9:1-8, 95:2-9.

[11]    Trans. 1 at 13:13-19, 14:1-5.

[12]    *Id.* at 14:1-5.   The Court, after careful consideration, credits Officer Cruz's testimony that he saw that none of the Nissan's occupants wore seatbelts.   Officer Cruz's testified without contradiction that the Nissan had shoulder belts and non-tinted windows.   *Id.* at 174:24-25, 175:1-2, 175:22-23.   Officer Cruz testified that as he drove towards the Nissan, he saw that the driver and front passenger did not have straps across their chests.   *Id.* at 176:1-8, 178:16-22.   Officer Cruz testified
(continued…)

Officer Cruz made a U-turn and sped up to catch the Nissan.[13]  Traveling behind the Nissan, Officer Cruz testified he observed two occupants appear to move their hands under the car seats, which led Officer Cruz to believe they were hiding objects.[14]  After following the Nissan a short distance, Officer Cruz

_____

(continued…)
that as he passed the Nissan, he saw that the backseat passengers also were not wearing seatbelts. *Id.* at 181:15-18.

[13]  *Id.* at 14:7-10.  Officer Cruz testified that he immediately turned on his emergency lights after making the U-turn.  *Id.*  Officer Cruz also testified that the Nissan did not pull over immediately, even though traffic was light and there was ample space along the side of the road.  *Id.* at 15:13-24.  Officer Cruz testified that the Nissan instead started to speed away.  *Id.* at 15:25, 16:1-3.  The Court does not credit this testimony because it conflicts with Officer Cruz's statements that he could not "really say for sure" when he turned on his emergency lights.  *Id.* at 43:19-25, 44:1-3.  Moreover, Officer Cruz's testimony is not corroborated by Officer Cruz's body camera footage.  To understand why, a digression into the mechanics of body cameras is necessary.

HPD body cameras have a "record" button that allow officers to start and stop the unit's recording function.  When Officer Cruz's body camera was activated, it automatically retained a period of a video-only recording before the camera was activated.  A viewer can determine approximately when the camera was activated by listening for when the audio recording begins.  *Id.* at 34:10-21, 35:4-9, 35:16-23, 80:1-10.

Based on Officer Cruz's body camera footage, the Court concludes that Officer Cruz activated his emergency lights roughly 40 seconds after making the U-turn and the Nissan pulled over in a reasonable time.  Officer Cruz's body camera footage reveals that his left hand was steering the car and his right hand remained on his in-car computer at the time he claimed he activated his emergency lights.  Cruz's Camera 0:22.  Based on Cruz's body camera footage, the Court concludes that Officer Cruz activated his emergency lights near the time he activated his body camera.  *Id.* 0:44.  The Court's conclusion is supported by HPD policy, which requires officers to activate their body cameras at the same time they activate their emergency lights.  Trans. 1 at 81:2-14.

[14]  Trans. 1 at 14:21-25, 15:1-10.

4

activated his emergency lights and body camera. The Nissan pulled into a nearby apartment complex and parked facing a low concrete curb.[15] Officer Cruz pulled up and parked his patrol car directly behind the Nissan.[16]

After parking, Officer Cruz stayed in his vehicle and radioed for backup. He also requested a "fingerprinting machine"—a device used to determine whether suspects appear in an HPD mugshot database.[17] The apartment complex where the Nissan and Officer Cruz were parked was a high-crime area with a substantial gang presence—including Mara Salvatrucha, also known as MS-13.[18] Officer Cruz radioed backup that the occupants were "cool, calm, and collected," and he told backup "Don't Rush. Don't kill yourself getting over here."[19]

Roughly a minute and a half after Officer Cruz parked, the driver and front passenger opened their car doors.[20] Officer Cruz got out of his vehicle and ordered them to close the doors.[21] Both quickly complied.[22] Officer Cruz walked to the side of the Nissan and observed that the occupants were wearing clothing

---

[15] *Id.* at 16:4-8, 56:2-10; Cruz's Camera 3:19.

[16] Cruz's Camera 3:19

[17] Trans. 1 at 17:5-7, 17:22-25.

[18] *Id.* at 16:9-17.

[19] *Id.* at 32:5-7, 60:5-8; Cruz's Camera 2:40.

[20] Trans. 1 at 18:7-13; Cruz's Camera 3:09-3:24.

[21] Trans. 1 at 18:7-13, 18:18-25, 19:1.

[22] *Id.* at 19:2-3.

consistent with that worn by the MS-13 gang.[23]   Officer Cruz reentered his patrol car and again radioed that the Nissan's occupants appeared "cool."[24]   After his approach, Officer Cruz ran the Nissan's temporary license plate.[25]   Officer Cruz testified that the license plate was not a match for a maroon Nissan Sentra.[26]

A little over seven minutes after Officer Cruz parked, HPD Officers Moises Saldana and Eddie Castillo arrived in their patrol car.[27]   The three officers removed, handcuffed, and patted down the Nissan's four occupants.  The front passenger and rear driver's side passenger—neither of whom are defendants in this case—were separately detained in the two HPD patrol vehicles.

Of particular relevance is Officer Saldana's pat down of the Nissan's driver, Defendant Mateo.   After Mateo stepped out of the Nissan, Officer Saldana handcuffed and frisked Mateo while questioning him in Spanish, asking for Mateo's name, age, where he lived, and if he had weapons on him or in the car.[28]   As part of the frisk, Officer Saldana grabbed Mateo's front right pants pocket.[29]

---

[23]    *Id.* at 19:4-10.  Members of MS-13 traditionally wear light blue and black colors, clothing that depicts the actress Marilyn Monroe, Chicago Bulls sportswear, and El Salvadorian soccer jerseys.  *Id.* at 9:8-20.   MS-13 gang members also traditionally wear light blue or black jewelry and shoelaces.  *Id.* at 9:21-25, 10:1-5. The officers' body camera footage reveals that the Nissan's occupants wore clothing consistent with that worn by the MS-13 gang.

[24]    Trans. 1 at 60:11-13.

[25]    *Id.* at 22:14-19.

[26]    *Id.* at 22:20-24.

[27]    *Id.* at 18:1-6.

[28]    Trans. 2 at 22:25, 23:1-6; Translation of Saldana's Camera Footage at ll. 4-38.

[29]    Cruz's Camera 9:43.

Officer Saldana's grab lasted less than two seconds. Officer Saldana testified that as soon as he grabbed the pocket, he immediately felt that the pocket contained bullets.[30]  Officer Cruz told Officer Saldana to "document these guys real good," meaning to document them as gang member.[31]  Officer Saldana then looked under Mateo's tee shirt's short sleeves and lifted the bottom of the shirt nearly to its neckline in search of gang tattoos.[32]

Officer Saldana escorted Mateo to Officer Cruz's patrol car and frisked him again.[33]  Officer Saldana testified that he frisked Mateo a second time because he was not confident after the first frisk whether Mateo had a weapon on his person.[34] After the second frisk, Officer Saldana removed from Mateo's front right pocket a small bag filled with .22 caliber bullets.[35]  Officer Saldana testified that after the second pat down and the removal of bullets from Mateo's pocket, he still was not satisfied that Mateo had no weapons on his person.[36]  Officer Saldana told Officer

---

[30]    Trans. 2 at 23:15-20.  Officer Saldana explained that he knew what bullets feel like because he has had bullets in his pockets before during training and when he goes to the range. *Id.* at 23:21-24.

[31]    Trans. 1 at 33:6-9, 42:2-5, 63:25, 64:1-10.

[32]    Saldana's Camera 3:38-3:46.  Officer Cruz's testimony corroborated that Officer Saldana lifted Mateo's shirt to look for gang tattoos on his chest.  Trans. 1 at 41:12-14, 64:11-12.

[33]    Saldana's Camera 4:08-4:35.

[34]    Trans. 2 at 24:9-15.

[35]    Saldana's Camera 4:30-4:35.

[36]    Trans. 2 at 26:2-4.  Officer Saldana explained that .22 caliber bullets are used in small pistols that can be almost anywhere on a suspect's person.  *Id.* at 26:5-8.

7

Cruz, who was escorting the front passenger to a police car, that he had discovered bullets.[37]

At the same time Officer Saldana patted down and questioned Mateo, Officer Castillo patted down and questioned Defendant Portillo, who had previously been sitting in the Nissan's rear passenger-side seat. Officer Castillo testified that when he patted down Portillo's front right pants pocket, he felt that the pocket contained bullets.[38] Officer Castillo asked Portillo in Spanish where the gun was and told Portillo that it would be worse for him if he did not talk.[39] Portillo did not respond. Officer Castillo jostled the outside of Portillo's front right pocket so that the bullets inside made an audible clinking noise, and again asked Portillo where the gun was.[40] Portillo then admitted that there was gun under the car seat.[41] Officer Castillo relayed the information to Officer Cruz, who then searched the car.[42] Officer Cruz recovered a Glock 9 mm handgun from under the

---

[37]     Cruz's Camera 11:40.

[38]     Trans. 2 at 104:16-25, 105:1-4.

[39]     *Id.* at 105:22-25, 106:1; Translation of Castillo's Camera Footage ll. 39-41.

[40]     Translation of Castillo's Camera Footage l. 43.

[41]     Trans. 2 at 106:24-26, 107:1-4, 129:8-18. Officer Castillo originally testified that he put his hand inside Portillo's pocket to manipulate the bullets. *Id.* at 120:1-12. The Court finds that Officer Castillo was confused when he originally answered and credits Officer Castillo's later testimony that he only manipulated the outside of Portillo's pocket. *Id.* at 125:7-9, 127:1-2, 128:25, 129:1-2.

[42]     Translation of Castillo's Camera Footage ll. 47-48.

front passenger seat and a .22 caliber revolver from under the driver's seat.[43]   The officers detained Portillo and Mateo in police vehicles.

Roughly 30 minutes after Officer Cruz recovered the first gun from the Nissan, Officer Cruz removed Mateo from the police vehicle and questioned him, using Officer Saldana as a translator.[44]   During the questioning, Officer Cruz offered to allow Mateo to call his mother, but asked whether there was anything Mateo wanted to let the officers know about the guns.  Mateo said there was not. Officer Cruz held out Mateo's cell phone to have Mateo unlock it.[45]  When Mateo did, Officer Cruz took the cell phone, and began asking Mateo questions about the phone's contents, stating that various songs and contacts on the phone indicated Mateo was part of the MS-13 gang.  Mateo denied being part of the gang.  The Officer Cruz told Mateo not to lie and that if he lied they would not let him make a phone call.  Officer Cruz asked Mateo if he joined MS-13 for protection.  Mateo admitted to being a MS-13 gang member, explaining he joined MS-13 for protection against the Cholo gang.  Officer Cruz said that Mateo might have to go to jail for not having a driver's license and for the seatbelt violation.  Mateo admitted that the Nissan's other occupants were also MS-13.  Officer Cruz's questioning of Mateo lasted over eleven minutes.

Some fifteen minutes after completing the questioning of Mateo, Officer Cruz removed Portillo, who was still handcuffed behind his back, from the patrol

---

[43]     Trans. 1 at 42:15-25, 43:1-4.

[44]     Cruz's Camera 44:07-55:43.

[45]     *Id.* 45:47-51, 46:45-40.

car and questioned him, again using Officer Saldana as a translator.[46] Officer Cruz started with general questions (where he was sitting in the Nissan, what his name was, where he lived, etc.). Officer Cruz then asked Portillo why he had a gun. Portillo responded that he had the gun for protection against the Cholos. Officer Cruz accused Portillo of being a MS-13 gang member and explained that Mateo had said everyone in the Nissan was in the gang. After Portillo denied being a gang member, Officer Cruz continued to press him, asking why Mateo would say Portillo was in MS-13 and why Portillo wore clothes consistent with MS-13. Officer Cruz said that if Portillo continued to lie there would be "issues." Officer Cruz offered to call Portillo's parents and let them know Portillo was going to jail for a seatbelt violation. Portillo's questioning lasted roughly eleven minutes.

Officer Cruz testified that when he questioned the Defendants, he had already decided to charge them with unlawful carrying of a weapon.[47] No *Miranda* warnings were given to either Mateo or Portillo.[48]

## II.  DISCUSSION

Defendants move to suppress the Glock 9 mm handgun and 9 mm bullets; the .22 caliber revolver and .22 bullets; and Defendants' statements made at the arrest scene. The Government contends that all evidence and statements were lawfully obtained. In the alternative, the Government contends any illegally obtained evidence because its discovery was inevitable. The Court concludes that all the physical evidence is admissible against both Defendants but that

---

[46]     Trans. 1 at 73:25, 74:1-19; Cruz's Camera 1:10:28-1:21:38.

[47]     Trans. 1 at 70:8-11, 74:20-22.

[48]     *Id.* at 73:20-24, 75:14-25.

Defendants' statements to Officer Cruz made after they were removed from the police vehicles should be suppressed because the statements were obtained in violation of *Miranda*.

### A.    The Duration of the Stop

Defendants do not challenge that Officer Cruz's initial traffic stop was a lawful seizure based on reasonable suspicion that the Nissan's occupants were not wearing seatbelts, an arrestable misdemeanor in Texas.  *See* TEXAS TRANSP. CODE ANN. §§ 533.001; 545.413(a), (d).   Instead, Defendants contend Officer Cruz unlawfully prolonged the stop by waiting for backup to arrive.   Defendants also argue that, after backup arrived, the officers unlawfully prolonged the traffic stop by detouring from the stop's mission to pursue a gang investigation.[49]

The Court is unpersuaded.   Officer Cruz's seven-minute delay to await backup was a minimally burdensome and objectively reasonable safety precaution related to the traffic stop's purpose.   Once Officers Saldana and Castillo arrived, the Officers took reasonable steps to attend to safety concerns related to the traffic stop's mission.   To the extent the officers impermissibly detoured from the traffic stop's mission, suppression of the physical evidence and statements is unwarranted.   No factual nexus exists between the detours from the purpose of the stop, the resulting brief extension, and the officers' acquisition of the evidence and statements.

---

[49]    Both Defendants have standing to challenge the traffic stop as an unconstitutional seizure.  *See Brendlin v. California*, 551 U.S. 249, 251, 258-59 (2007) (holding both driver and passenger are seized by, and thus have standing to challenge, a traffic stop, its duration, and any search that results from the unlawful seizure).

## 1.    Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.   "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is "reasonableness."'"  *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City. v. Stuart*, 547 U.S. 398, 403 (2006)).

In general, "on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights."  *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993).  This burden, however, shifts to the Government if the search or seizure in question was performed without a warrant.  *See United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).  The Government must satisfy that burden by a preponderance of the evidence.  *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."  *Whren v. United States*, 517 U.S. 806, 809-10 (1996).  "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."  *Id.* at 810.  This "reasonableness" inquiry is objective; it does not depend "on the actual motivations of the individual officers involved."  *Id.* at 813.

In the Fifth Circuit, challenges to traffic stops are processed under a two-step inquiry.  *See United States v. Bams*, 858 F.3d 937, 942 (5th Cir. 2017); *United*

*States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). The district court first must determine "whether the stop was justified at its inception," that is, whether the officer had an "objectively reasonable suspicion" that a traffic offense occurred or was occurring. *See Bams*, 858 F.3d at 942.[50] If the stop was justified, the next step is to determine "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Id.* (quoting *Andres*, 703 F.3d at 832). A traffic stop must "last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id.* (quoting *Andres*, 703 F.3d at 832).

The Supreme Court's decision in *Rodriguez v. United States* guides this Court's approach to the second step. *See* 135 S. Ct. 1609, 1614-16 (2015). There, police pulled over a vehicle for swerving onto the shoulder. *Id.* at 1612. After issuing a written warning and returning the driver's license, registration, and proof of insurance, the officer continued to detain the vehicle and its driver to wait for backup so that he could safely conduct a dog sniff. *Id.* at 1613-14. The dog discovered methamphetamine, and the driver sought to suppress the evidence. *Id.*

---

[50] When evaluating reasonable suspicion, courts must consider "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). A "divide-and-conquer analysis" that examines each factor supporting reasonable suspicion in isolation is not permitted. *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). Moreover, courts must allow law enforcement "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418). Finally, the police have reasonable suspicion if they are "able to articulate specific facts that supported their belief that there was *something illegal* afoot . . . , even if they [cannot] link those facts to a particular specific crime." *See Pack*, 612 F.3d at 356.

at 1613. The district court and Eighth Circuit rejected the driver's challenge, holding that the police's seven or eight minute delay was a permissible *de minimis* seizure. *Id.* at 1613-14. The Supreme Court reversed, rejecting the *de minimis* rule and holding the police's extension of the otherwise completed traffic stop was unlawful absent independent reasonable suspicion supporting the dog sniff. *Id.* at 1615-17. The Supreme Court remanded for a determination of whether reasonable suspicion of criminal activity justified extension of the stop beyond completion of the traffic infraction investigation. *Id.* at 1616-17.

*Rodriguez* clarified that authority for a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 1614. This is because the constitutionally tolerable duration of any seizure "is determined by the seizure's 'mission.'" *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 403, 407 (2005)). For a traffic stop, the seizure's mission is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* That "mission" also includes inquiries "incident" to the stop, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615. The Court recognized that "[t]raffic stops are 'especially fraught with danger to police officers,' so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at 1616 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). Nevertheless, "[o]n-scene investigation into *other* crimes" and safety precautions taken "to facilitate such detours" impermissibly prolong the stop. *Id.* at 1616 (emphasis added).

### 2. Officer Cruz's Seven-Minute Delay Awaiting Officer Backup Was Justified By Objectively Reasonable Safety Concerns

The Court concludes that officer safety permitted the roughly seven-minute seizure of Defendants as Officer Cruz awaited backup. Officer Cruz's safety concerns were objectively strong. The traffic stop occurred in a high-crime area with a substantial gang presence. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis."). The Nissan had four occupants, and Officer Cruz was alone. *See Maryland v. Wilson*, 519 U.S. 408, 413 (1997) ("[T]he fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer."). Officer Cruz observed two occupants make body movements consistent with putting something beneath their seats. *See United States v. Grant*, 349 F.3d 192, 198 (5th Cir. 2003) (noting that "furtive movements in the car" and "fumbling around in the passenger seat" added to officer's reasonable suspicion of criminal activity). When Defendants pulled over, they parked in an apartment complex Officer Cruz knew to be frequently the location for violent crime and had a gang presence. Once Defendants pulled over, Officer Cruz promptly called for backup, which arrived roughly seven minutes later. This delay was constitutionally tolerable because it was a "negligibly burdensome precaution" related to the mission of the traffic stop. *See Rodriguez*, 135 S. Ct. at 1616.

### 3. The Officers Reasonably Extended the Stop to Attend to Related Safety Concerns

Defendants contend that the officers did not diligently pursue a seatbelt investigation and their extensive safety precautions—removing the occupants from the Nissan, patting them down, questioning them about weapons, and escorting

two of them to patrol vehicles—were taken to facilitate a gang investigation, not to issue a seatbelt citation. Accordingly, Defendants argue that the officers' precautions unconstitutionally prolonged the stop.

The Court is unpersuaded. First, it is fundamental that the officers' subjective state of mind is irrelevant. The Court's inquiry must be objective and does not depend "on the actual motivations of the individual officers involved." *See Whren*, 517 U.S. at 813. Thus, the Court does not consider *why* the officers took the safety precautions. Instead, the Court considers only whether those safety precautions objectively facilitated the safe completion of the traffic stop's mission—investigating and potentially issuing a citation to four individuals for the observed seatbelt violations. The Court concludes they did.

As a matter of course, an officer who has lawfully stopped a car may order the car's driver and passengers to exit the car. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam) (driver); *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (passengers). Once outside the vehicle, a lawfully seized driver or passenger may be patted down for weapons "upon reasonable suspicion that they may be armed and dangerous." *See Johnson*, 555 U.S. at 332 (quoting *Knowles v. Iowa*, 525 U.S. 113, 117-18 (1998)). "Such a limited intrusion does not violate the fourth amendment if the searching officer can point to specific and articulable facts suggesting actual physical risk to himself or others." *United States v. Sink*, 586 F.2d 1041, 1048 (5th Cir. 1978).

Defendants do not contest that the circumstances gave rise to reasonable suspicion they may be armed and dangerous. As previously noted, several factors added to the officers' reasonable suspicion: the stop occurred in a high crime apartment complex; the Nissan contained four occupants; and before the Nissan pulled over, Officer Cruz observed two of the Nissan's occupants appear to hide

16

objects beneath the seats. *See Wardlow*, 528 U.S. at 124; *Wilson*, 519 U.S. at 413; *Grant*, 349 F.3d at 198. Moreover, the Nissan's occupants all wore clothes consistent with the MS-13 street gang. *Cf. United States v. Roelandt*, 827 F.3d 746, 749 (8th Cir. 2016) ("Knowledge of gang association and recent relevant criminal conduct, while of doubtful *evidentiary* value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a *Terry* stop." (alteration in original) (quoting *United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995))); *United States v. Santio*, 351 F. App'x 324, 329 (10th Cir. 2009) (unpublished) ("Although gang affiliation or prior criminal conduct cannot, standing alone, create a reasonable suspicion to support a search or seizure, under certain circumstances it may be an appropriate factor in determining if reasonable suspicion exists for a detention or search."). Based on the totality of the circumstances, the Court concludes that the officers possessed reasonable suspicion to believe the occupants were armed and dangerous, and thus were entitled to pat down the occupants.

Defendants contend that the safety precautions the officers took were excessive for a traffic stop and thus not reasonably related to the traffic stop's mission. However, the justification for the stop does not limit the reasonable safety precautions officers may take. The Supreme Court has "emphasized" that "the risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a [traffic] violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.'" *Johnson*, 555 U.S. at 331 (quoting *Wilson*, 519 U.S. at 414).

Defendants further argue that the officers had to simultaneously take precautions while pursuing a seatbelt investigation. While the officers must

"diligently pursue their investigation," the Court "should not indulge in unrealistic second-guessing." *See United States v. Sharpe*, 470 U.S. 675, 685-86 (1985). *Cf. United States v. Hill*, 852 F.3d 377, 384 (4th Cir. 2017) ("[T]he Supreme Court's decision in *Rodriguez* does not require courts to second-guess the logistical choices and actions of a police officer that, individually and collectively, were completed diligently within the confines of a lawful traffic stop.") It may have been possible, in retrospect, for the officers to secure the scene *and* simultaneously take more investigative steps. But that possibility does not make it unreasonable for the officers to fully secure the scene before taking steps to investigate and issue a citation for the seatbelt violations.[51]

### 4. The Officers' Alleged Detours Do Not Warrant Suppression of the Guns, Bullets, or Statements

Defendants contend that, even if most of the officers' safety precautions were reasonable, Officer Saldana's lifting of Mateo's shirt to look for tattoos has no connection to officer safety. Even assuming these actions were unconstitutional detours, the Court concludes that suppression of the guns, bullets, and statements is not warranted. The detours lack a factual nexus to the discovery of physical evidence or the Defendants' statements.

The exclusionary rule supplies the typical remedy for Fourth Amendment violations: suppression of the evidence at trial. *See Mapp v. Ohio*, 367 U.S. 643,

---

[51]    Defendants contend that Officer Cruz's request for a fingerprint machine was a part of a gang investigation and unrelated to the traffic stop's mission. Assuming the fingerprint machine would not further the traffic stop's mission and served no protective function, there is no evidence that demonstrates that Officer Cruz's request for a fingerprint machine extended the stop. Officer Cruz requested a fingerprint machine over dispatch after he permissibly extended the stop to request backup. Because the request occurred within the time Officer Cruz was entitled to prolong the stop, the request did not extend the stop.

648 (1961). "The exclusionary rule reaches not only the evidence uncovered as a direct result of the violation, but also evidence indirectly derived from it—so-called 'fruit of the poisonous tree.'" *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018) (quoting *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016)). Physical evidence as well as verbal statements acquired downstream of a violation can be such fruit. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

Under the exclusionary rule, "evidence is only susceptible to exclusion if it is a *product* of the police's illegal conduct." *United States v. Beene*, 733 F. App'x 740, 750 (5th Cir. 2018) (alteration in original) (citing *Segura v. United States*, 468 U.S. 796, 815 (1984)); *see also Hudson v. Michigan*, 547 U.S. 586, 592 (2006) ("Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression."). "The defendant 'must go forward with specific evidence demonstrating taint,' even though the Government holds 'the ultimate burden of persuasion to show that its evidence is untainted' once a Fourth Amendment violation is established." *Beene*, 733 F. App'x at 752 (quoting *United States v. Webster*, 750 F.2d 307, 314-15 (5th Cir. 1984)).

Defendants do not meet their burden to "go forward with specific evidence demonstrating taint," *i.e.*, to show the detour or the delay caused by the detour was a but-for cause of the seizure of the guns and bullets. *See id.* (quoting *Webster*, 750 F.2d at 314-15). At least two Courts of Appeals have declined to suppress evidence obtained after traffic stop detour because the detour was not a "but-for" cause of obtaining the evidence. *See United States v. Cone*, 868 F.3d 1150, 1155 (10th Cir. 2017); *United States v. Peralez*, 526 F.3d 1115, 1121-22 (8th Cir. 2008); *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007).

The decision in *Cone* is instructive. There, the Tenth Circuit held that potentially impermissible travel plan questions lacked a factual nexus with the

discovery of drugs in the defendant's vehicle and thus suppression of the drugs was unwarranted. *See* 868 F.3d at 1155. After pulling over the defendant for a broken license plate light, the officer inquired about the defendant's travel plans. *Id.* at 1152. The officer then asked the defendant to step out of the vehicle for safety concerns so that the officer could run a warrant check. *Id.* When the defendant got out of the car, the officer noticed a gun poking out of the vehicle's center console. *Id.* When the gun was retrieved, the officer noted the smell of marijuana, resulting in a car search that revealed marijuana and methamphetamine. *Id.* The Tenth Circuit concluded that the "causal chain flows naturally from the request that Defendant exit his vehicle to the discovery of the drugs" and that the officer's decision to conduct a background check and decision to order the defendant out of the vehicle were unrelated to the travel plan question. *Id.* at 1155.

Here, similar to *Cone*, the "causal chain" to the seizure of the bullets, the car search which revealed the guns, and Defendants' statements "flow[] naturally" from the officers' discovery of bullets on Mateo and Portillo pursuant to the protective frisks. Officer Saldana felt the bullets in Mateo's pocket *before* potentially detouring from the traffic stop's mission by searching for tattoos. Logically, therefore, Officer Saldana's later search for tattoos cannot be a but-for cause of the discovery of bullets. Moreover, Officer Saldana's decision to lift Mateo's shirt had no effect on Officer Castillo's ongoing pat down and questioning of Portillo, which was occurring on the other side of the Nissan. As the Court discusses below, the officers' discovery of bullets justified the seizure of the bullets and the search of the Nissan, resulting in the discovery of the guns, Mateo's and Portillo's arrests, and their questioning. Furthermore, Officer Saldana's tattoo search was extremely brief, occurred while other officers were taking appropriate safety precautions regarding the other individuals in the Nissan, and revealed no

information that might support extending the stop or searching the Nissan. Defendants do not argue or point to anything in the record that indicates that if Officer Saldana had not searched for the tattoos, the officers would not have searched the car.

Defendants do not meet their burden to identify "specific evidence demonstrating" the search for tattoos was a but-for cause of the acquisition of the challenged evidence and statements. *See Beene*, 733 F. App'x at 752 (quoting *Webster*, 750 F.2d at 314-15). Accordingly, even if the search for those tattoos was an unlawful detour, that does not warrant suppression of the guns, bullets, or statements.

### B.     The *Terry* Searches and Seizures of Bullets

Defendants next challenge the constitutionality of the *Terry* searches and seizure of bullets from their pockets. Defendants do not contest that the *Terry* searches were supported by reasonable suspicion that they were armed and dangerous. Instead, Defendants contend that the scope of the searches was excessive and the seizure of bullets from their pockets was illegal. The Court is unpersuaded: the scope of the officers' *Terry* searches was permissible and, once the officers knew the Defendants' pockets contained bullets, the officers were entitled to seize the bullets for their protection.

"The Supreme Court has carefully stressed . . . that the scope of [*Terry*] searches must be limited to [its] protective purpose," *Gov't of Canal Zone v. Bender*, 573 F.2d 1329, 1331 (5th Cir. 1978), and "not to discover evidence of crime," *Adams v. Williams*, 407 U.S. 143, 146 (1972). Once an officer knows an object he or she is touching or manipulating is not a weapon, the search of that object must cease. *See United States v. Maldonado*, 42 F.3d 906, 909 (5th Cir. 1995). The officer may not continue to squeeze, slide, or otherwise manipulate the

pocket's contents to determine what the pocket contains. *See Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993). But "so long as an officer is investigating an object that reasonably may be a weapon, the *Terry* search may continue." *See Maldonado*, 42 F.3d at 909. Moreover, if during a lawful *Terry* search an officer feels an object "whose contour or mass makes its identity immediately apparent" as contraband, an immediate, warrantless seizure of the object is "justified by the same practical considerations that inhere in the plain-view context." *See Dickerson*, 508 U.S. at 375-76.

Mateo contends Officer Saldana exceeded the scope of his *Terry* search authority by initially grabbing Mateo's pocket rather than merely patting the pocket down with an open palm. The Court agrees that the Officer Saldana "grabbed"—within the common sense of the word—Mateo's front pocket. Nevertheless, the Court concludes that Officer Saldana's grab of Mateo's pocket was a permissible protective search under *Terry*. *See United States v. Lee*, 248 F. App'x 525, 529 (5th Cir. 2007) (per curiam) (unpublished) ("[T]here is no legal precedent by the Supreme Court, this court, or any other circuit to reverse a district court's factual conclusion that an officer was searching for weapons because 'grasping a pocket' is not a pat-down as a matter of law."); *United States v. Casado*, 303 F.3d 440, 449 (2d Cir. 2002) ("[A] patdown is not the only type of search authorized by *Terry*, and that there are circumstances in which a patdown is not required."). Officer Saldana was within his authority to initially momentarily grasp Mateo's baggy pants pocket to discern whether it contained a weapon without first using a flat hand as a search technique on the pocket.

Defendants next contend the officers impermissibly slid or manipulated the bullets in order to identify them. The record does not support Defendants' position. Both Officers Saldana and Castillo testified that they immediately

identified the relevant pockets as containing bullets as soon as they touched the relevant pocket. The Court credits this testimony. Because both officers immediately recognized the relevant pockets to contain bullets, their discovery of the bullets did not result from exceeding the permissible scope of the *Terry* search. *See Dickerson*, 508 U.S. at 375-76.

Finally, Defendants contend that the officers' seizure of the bullets after they were identified as such was impermissible. The Court is unpersuaded. After recognizing the Defendants possessed bullets, the officers were entitled to seize the bullets for their protection. Bullets are "an essential part of a lethal weapon." *See United States v. Johnson*, No. 16-15690, 2019 WL 1615283, at *4 (11th Cir. Apr. 16, 2019) (*en banc*) (upholding seizure of bullets from a handcuffed defendant's pocket during a pat down). The officers were "entitled to 'take steps to assure' [themselves] that the ammunition in [Defendants'] pocket[s] would not be loaded into 'a weapon that could . . . fatally be used against [them]." *See id.* at *6 (quoting *Maryland v. Buie*, 494 U.S. 325, 333 (1990)). Both Defendants were handcuffed, but "that did not eliminate the danger posed by the ammunition"; handcuffs fail on occasion and suspects sometimes reach for weapons even when handcuffed. *See id. See also United States v. Sanders*, 994 F.2d 200, 209 (5th Cir. 1993) ("Albeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself. Finally, like any mechanical device, handcuffs can and do fail on occasion.").

Officer Saldana's seizure of the bullets served a second protective purpose; removing them from Defendants' pockets for inspection "could inform [the officers] of what caliber or type of gun might be nearby," facilitating the gun's recovery. *See Johnson*, 2019 WL 1615283, at *4. Similarly, Officer Castillo's

momentary manipulation of the bullets facilitated his questioning of Portillo and ultimately the recovery of the gun. His manipulation occurred when he knew the pocket's contents and was less intrusive than a permissible full seizure of the bullets. The officers were authorized to seize the bullets they immediately recognized in Defendants' pockets. *See United States v. Jackson*, 179 F. App'x 921, 931 (6th Cir. 2006) (per curiam) (unpublished) (upholding seizure of bullets when the officer immediately recognized the bullets during a pat down search); *United States v. Scott*, 72 F.3d 139, 1995 WL 749775, at *2 (10th Cir. 1995) (unpublished) (same); *United States v. Ward*, 23 F.3d 1303, 1306 (8th Cir. 1994) (same); *Scott v. State*, 877 P.2d 503, 509 (Nev. 1994) (same); *United States v. Whitsett*, No. 1:05-CR-31, 2005 WL 3359082, at *7 (N.D. Ind. Dec. 9, 2005) (same).

The Defendants' challenges to admission of the bullets seized from their pockets fails. Thus, the Court will not suppress the bullets.

## C.     Car Search for Guns

Defendants seek suppression of the firearms found in the Nissan because, according to Defendants, the firearms were seized without a warrant to search the car and without probable cause to believe the car contained contraband. The Government presents several theories to justify the warrantless car search.[52] The

---

[52]     First, the Government contends that probable cause to search the Nissan existed based on Officer Cruz's observation of trace marijuana. Second, the Government asserts that the car search was justified as a protective search based on reasonable suspicion that the Nissan contained firearms. Third, the Government argues that the car search was authorized as a search incident to Mateo's arrest for driving without a license. Alternatively, the Government contends that even if the car search was unconstitutional, suppression is unwarranted because discovery of the firearms was inevitable following an inventory search. Finally, the Government
(continued…)

Court concludes that the search of the Nissan was justified based on reasonable suspicion that the Nissan contained firearms that the former occupants could immediately access.

"[P]rotective pat-down/frisk searches authorized by *Terry* . . . extend to passenger compartments of automobiles." *United States v. Wallen*, 388 F.3d 161, 165 (5th Cir. 2004). A "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (quoting *Terry*, 392 U.S. at 21).[53] The fact that the vehicle's occupants are handcuffed does not eliminate their ability to "gain immediate control of weapons" because "suspects in handcuffs can remain a danger to the police" and a traffic stop may result in the occupants' release back to the vehicle. *See Wallen*, 388 F.3d at 166. "[T]he fear of a person's gaining immediate control of weapons does not limit itself to the time of the stop, but extends through the entire interaction between him and the officer." *Id.*

Here, the officers possessed reasonable suspicion that the Nissan contained firearms that its former occupants could gain control over. The stop occurred in

---

(continued…)
argues that because Portillo was a passenger, he lacks standing to challenge the search.

[53]   The searching officer does not need a "subjective fear" for his safety to justify his protective search. *See United States v. Baker*, 47 F.3d 691, 693-94 (5th Cir. 1995). Instead, the standard is objective. *See id.*

the parking lot of high-crime apartment complex known for its heavy gang presence. Before the Nissan pulled over, Officer Cruz observed two of the occupants appear to hide things under their seats. All the occupants wore clothing consistent with the MS-13 gang. The officers found bullets in Mateo's and Portillo's pockets but did not find the associated guns.[54] Portillo told Officer Castillo that there was a gun under the seat and Officer Castillo relayed this information to Officer Cruz.[55] When the search occurred, Mateo and Portillo were not secured in patrol vehicles and none of the Nissan's former occupants had been

---

[54] Multiple courts treat the discovery of bullets as a weighty factor when determining whether reasonable suspicion exists to conduct a protective car search for firearms. *See United States v. Lurry*, 483 F. App'x 252, 254 (6th Cir. 2012) (unpublished) (upholding protective car search for weapons when officer observed shotgun shells in the car and the defendant previously made "furtive movements" inside the car); *United States v. Dyer*, 178 F.3d 1297, 1999 WL 115495, at *3 (6th Cir. 1999) (per curiam) (unpublished) ("When Officer Baker found bullets in a fanny pack, he certainly had articulable reason to search further for a weapon."); *United States v. Richard*, 967 F.2d 1189, 1193 (8th Cir. 1992) (upholding a limited sweep of a vehicle's passenger compartment when the officer noticed .22 caliber cartridges sitting in plain view in the passenger compartment). "[C]ommon sense and logic dictate that a bullet is often associated with a gun." *Johnson*, 2019 WL 1615283, at *4 (quoting *People v. Colyar*, 996 N.E.2d 575, 585 (Ill. 2013)). *Cf. United States v. Johnson*, 401 F. App'x 25, 28 (6th Cir. 2010) (unpublished) (holding the officers had reasonable suspicion to perform a pat down for firearms when they observed that defendant's vehicle contained a box of ammunition); *United States v. Meadows*, 571 F.3d 131, 142 (1st Cir. 2009) ("We think it uncontroversial that the discovery of ammunition—but not a gun—in the car from which a suspect fled could, together with the other facts present in this case, lead an officer to reasonably suspect that the fleeing suspect possessed the gun that went with the ammunition.").

[55] Portillo contends that this statement was elicited in violation of *Miranda*. Even assuming his statement was obtained in violation of *Miranda*, the gun would still be admissible because nontestimonial fruit of a *Miranda* violation is admissible. *See United States v. Lim*, 897 F.3d 673, 691 (5th Cir. 2018).

26

formally arrested. Viewed holistically, these facts establish that Officer Cruz possessed adequate suspicion to conduct a protective search of the Nissan. *Cf. United States v. Baker*, 47 F.3d 691, 695 (5th Cir. 1995) (upholding protective car sweep of a vehicle's passenger compartment when the vehicles occupants appears extremely nervous and gave inconsistent explanations for their trip, the officer observed a box of 9 mm bullets on the floorboard, and one of the occupants said she did not know where the gun was, a remark the officer interpreted to mean there was a gun in the car). This aspect of the Motions is **denied**.

### D. Defendants' Statements

Defendants argue that all their statements at the scene of the traffic stop were obtained in violation of *Miranda*.[56] The Court agrees with Defendants in part. Defendants' initial statements to the officers after they were removed from the Nissan were not obtained in violation of *Miranda*, and thus will not be suppressed. However, Mateo's and Portillo's subsequent statements made after they were removed from the patrol car did violate *Miranda* and will be suppressed.

#### 1. Legal Standard

"*Miranda* warnings must be administered prior to 'custodial interrogation.'" *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). "A suspect is . . . 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in

---

[56] Portillo also moves to suppress statements he made the day after his arrest. The content or circumstances of those statements was not introduced at the evidentiary hearing. Portillo however concedes that the statements were obtained after he was Mirandized. Even assuming Portillo demonstrates the guns, ammunition, and prior statements were illegally seized, he has failed to go forward with specific evidence that the prior illegal conduct tainted his later statements.

the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (alteration in original) (quoting *Bengivenga*, 845 F.2d at 596). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *Bengivenga*, 845 F.2d at 596.

"Custody for *Miranda* purposes requires a greater restraint on freedom than seizure under the Fourth Amendment." *Cavazos*, 688 F.3d at 193. "A determination of whether a defendant is 'in custody' for *Miranda* purposes depends on the 'totality of circumstances.'" *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "[T]he subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *Id.* (alteration in original) (quoting *J.D.B.*, 564 U.S. at 271).

"It is well established that ordinary traffic stops do not place a person 'in custody' for purposes of *Miranda*." *United States v. Broca-Martinez*, 162 F. Supp. 3d 565, 568 (S.D. Tex. 2016), *aff'd*, 855 F.3d 675 (5th Cir. 2017). Officers may, as a matter of course, order the detainee from the car and "ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). "This is not to say, however, that routine

28

traffic stops cannot become custodial." *Broca-Martinez*, 162 F. Supp. 3d at 568. "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." *McCarty*, 468 U.S. at 440. The Fifth Circuit has identified several important factors to consider:

> (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory, nature of the questioning; (4) the amount of restraint on the individual's physical movement; and (5) statements made by officers regarding the individual's freedom to move or leave.

*United States v. Coleman*, 610 F. App'x 347, 353 (5th Cir. 2015) (per curiam) (unpublished).

### 2. Defendants' Initial Statements After Being Removed from the Nissan Were Not Obtained in Violation of *Miranda*

Portillo's and Mateo's statements immediately after being removed from the Nissan, including Portillo's statement that the guns were in the Nissan, did not occur while Portillo was "in custody" for purposes of *Miranda*. The length and location of the questioning weighs heavily against the conclusion that Defendants was in custody at the time. Officer Castillo's questioning occurred moments after Portillo had been removed from the vehicle and handcuffed, while Portillo was mere feet from the Nissan and from another of the Nissan's occupants. Castillo did not identify what crime he suspected Portillo had committed and no clearly incriminating evidence had been recovered. As neither Defendant was "in custody" at the time they made their relevant statements, their statements were not obtained in violation of *Miranda*. The Court therefore will not suppress Defendant's initial statements after being removed from the Nissan.

### 3. Mateo and Portillo's Later Incriminating Statements Were Obtained in Violation of *Miranda*

Mateo and Portillo were "in custody" for purposes of *Miranda* when they were removed from the patrol car and questioned by Officer Cruz. Roughly 30 minutes had elapsed from the time the first gun was seized from the Nissan to when Mateo was questioned. For Portillo, almost an hour had elapsed. Both Defendants were questioned by two officers while in Defendants were in handcuffs. *See Broca-Martinez*, 162 F. Supp. at 570 ("The 'use of physical restraints on a suspect is a key factor in determining whether the defendant's freedom of movement was restricted to the degree associated with a formal arrest [for Miranda purposes].' . . . Whether the suspect was placed in physical restraints is a factor that has been given particular importance in cases where, as here, the suspect was held in the back of a police car." (quoting *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000)). Officer Cruz's questions were accusatorial, asserting Mateo and Portillo were member of MS-13 and warning them of the consequences of lying. Officer Cruz also intimated that Defendants would go to jail for a traffic violation. *Cf. Coleman*, 610 F. App'x at 353 (affirming finding that suspect was not in custody when "[t]he stop was conducted on the side of a public roadway, where a traffic stop is normally conducted; [the officer] never engaged [the suspect] in specific, lengthy or accusatory questioning about any suspected offense; and [the suspect] was either sitting in his car or standing outside it, unrestrained, during the entire stop.").[57] Based on the totality of the circumstances, the Court concludes that Defendants were in custody when they

---

[57] Mateo's cellphone was also seized, which "certainly weighs in favor of custody, but not heavily so." *See Broca-Martinez*, 162 F. Supp. 3d at 569.

were questioned by Officer Cruz.  As Defendants made their statements during custodial interrogation without receiving the *Miranda* warnings, the Court will suppress their statements.

## III.    CONCLUSION AND ORDER

The Court concludes that the guns seized from the Nissan and the bullets seized from the Defendants are admissible.  The Court, however, concludes the Defendants were subject to custodial interrogation, without receiving the *Miranda* warning=.  It is therefore

**ORDERED** that Defendant Portillo's Motion to Suppress [Doc. # 24] is **GRANTED in part and DENIED in part**.  Portillo's statements made to Officer Cruz after Portillo was removed from the patrol car are **SUPPRESSED**.  It is further

**ORDERED** that Defendant Mateo's Motion to Suppress [Doc. # 25] is **GRANTED in part and DENIED in part**.  Mateo's statements made to Officer Cruz after Mateo was removed from the patrol car are **SUPPRESSED**.

SIGNED at Houston, Texas, this  10th  day of **May, 2019.**


_____
NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE

P:\ORDERS\11-2018\650MSupp.docx  190510.1315